The first case called this morning is Agenda Number 4, Case Number 120205 and Re the Marriage of Tuke and P. Roy. Counsel for Propellant and Affily ready? Yes, sir. You may proceed, thank you. Good morning, Your Honors. May it please the Court. My name is Leanne Finkel. I represent the Appellant, Donna Tuke, formerly known as He-Roy. The maintenance issue in this case, Your Honors, is simple and straightforward. The trial court never intended to utilize a formula in reducing Donna Tuke's maintenance from $35,000 per month to $27,500 per month. The appellate court's decision is somewhat inexplicable. Judge Jacobius issued a 33-page opinion which makes clear that he considered all of the statutory factors under Sections 504 and Section 510 in determining the reduction of Donna's maintenance. Nowhere in his opinion does he allude to a formula. The only place that he alludes to a formula at all is in the conclusion to his 19-page decision denying David He-Roy's motion to reconsider. In that conclusion, the court was responding to Mr. He-Roy's statement that $330,000 per year maintenance represents 33% of his law firm income. And Judge Jacobius said, that's a transparent fact. But he goes on to say that in addition to his law firm income of $990,000, Mr. He-Roy, for the years 2006 through 2009, had additional income from his family business, rental income from the commercial property that houses his family business, and from other sources. In the very paragraph of his conclusion where he makes reference to a 25%, about 25%, approximating 25%, he refers to those four years of cash flow. David, in his brief, does not fully set forth the quote of the trial judge. The only statement you'll see in David's brief is that the court approximates an award of about 25% of David's cash flow. The actual statement that Judge Jacobius made was, based upon this additional income, in other words, the approximately $350,000 additional income, and David's statement, in other words, his law firm income of $990,000, the court approximates an award of about 25% of David's cash flow. Somehow, the appellate court took one year, 2009, used David's expert, who the court found was less credible than Donna's expert, and somehow construed that the trial court intended an order equal to 25% of David's cash flow for the year 2009, except you won't see that anywhere in the judge's opinion. This is a clear example of the appellate court overstepping its bounds and reversing the trial court when the court acted properly and within its discretion. In doing so, we should recognize that although the court was not intending to use a formula, had he intended to do so, the record supports that his order of $27,500 per month is less than 25% of David's cash flow. Because when you add the $350,000 to his law firm income of $990,000, $27,500 per month is less than 25% of his cash flow. Two other things. The court reduced Donna's maintenance by $2,000 per month, having already reduced it by $7,500 from the $35,000 that the But even worse, perhaps, is the retroactivity, which it doesn't appear that the appellate court even considered. The appellate court held that by making the order retroactive, Donna now owes $175,000 in retroactivity, and as the trial court held, anything more than $70,000 because the trial court did not make the order retroactive to the date that David filed because he found it to be most inequitable to create a windfall to David and an intolerable hardship to Donna. Unless the court has any questions, I'm going to move on to the attorney's fees issue. Mr. Finkle, can you just quickly go over how, if at all, the Schneider case impacts your argument? The Schneider case, only your honors can really discern what was intended in the Schneider case. It gets quoted all the time for the inability to pay argument. But it doesn't appear that this court has ever had a case, such as you have before it now, where you were really required to examine what the legislature intended in terms of ordering contribution awards. It does not appear that you've ever had the legislative history to do so because it doesn't appear that there was ever a debate in any of the cases, or at least in any of the language cases that have appeared to me, of should we be applying inability to So this is an opportunity for the court to settle the disharmony in all of the districts, which every district gives some recognition to the factors. The Shen case is the only case that specifically holds that showing inability to pay is a prerequisite. So it's not clear whether or not the Schneider case, the mention in the Schneider case of inability to pay was dicta, because it certainly wasn't necessary to come to the conclusion that the court came to. Because the trial court in Schneider considers the 513 factors and could have been affirmed on that basis alone. So in addressing Schneider, I'd like to address the opportunity before this court to consider these arguments and to create appropriate law going forward. And is it your position then that there really isn't a stare decisis effect to Schneider as it affects this case, and you're looking more for, I guess, not clarification really, but a further assertion of where Schneider was going? I say yes, Your Honor, but I would also say that to the extent that there is a stare decisis effect, that it's within the problems of this court to reconsider its rulings based upon the strong public policy behind not allowing a litigant to be disadvantaged in a divorce case with their spouse because their spouse can afford litigation, but the litigant cannot. What role do Section 504 and 503 have in your analysis? Well, in our analysis, Your Honor, Section 508 is the statute that you go to in terms of contributions at the end of a divorce case. Section 508 directs us to 503J2. 503J2 says that the property factors under Section 503 are to be used in making a determination as to a contribution award, and that Section 504 is the statute to be used in determining a contribution award in a maiden situation, which makes perfect sense. Because, for example, in this case, the court had 21 days of evidence on the statutory factors. The court was in the very best position to fashion an appropriate order because every case is different, and it serves judicial economy because the court's already heard all of the maidens' issues and now is in a position fully understanding the parties' respective financial resources, which is what Section 508 talks about. But you won't find inability to pay anywhere in the statute except for one place, which I'll get to in a moment. So, yes, 504 upholds the policy of the state, which is so transparent with legislatures because that's the name of the statute, leveling the playing field, the principles of equality and to be able to litigate on an equal footing. Is there any consideration of ability to pay in that lexicon? Absolutely. The fact is absolutely required. It looks at each party's financial resources. It looks at their ability to earn income in the future. It looks at what their contributions were to the marriage. It's a comprehensive scheme that allows the court to fashion an appropriate remedy in a long-term marriage where a wife was awarded maidenhoods at the time of the trial and has spent, Your Honors, over $1.3 million to both secure her marriage and pay for it. Of that $1.3 million, over $750,000 in post-judgment litigation, completely defeating the purpose behind awarding maidenhoods. And that's what the trouble is with the inability to pay standard, Your Honor. If I may, for a moment, there's no question the trial court, the most narrow approach that this court can take is to reverse the appellate court and find that they were wrong when they found that paying all of her fees does not undermine her financial stability. What does Donna have? Donna has $900,000 in retirement account money. She's got a house with a $400,000 mortgage that doesn't compare to the marital residence. And nobody is here suggesting a tag date for Donna. But it's all relative. And it's the standard of living that she had during the marriage and trying to hold on to as much of that as she can. By being required to pay her own attorney's fees in full, her ability is being undermined because there's no place left to pay it from other than her home that she hopes to live in for the rest of her life. Her retirement funds, which are critical to her future, which the trial judge found was sacrosanct and should not be touched, and her personal property. So where is she going to pay it from? Out of her reduced maintenance? Out of her retirement accounts? She should be required to sell her home? It was reversible error for this court to not give deference to Judge Jacobius' decision awarding just a partial proportion of the attorney's fees. $125,000 of $345,000 was stipulated as being reasonable. $35,000 to defend an appeal where the request for it was $100,000. So in 2012, when the court entered its order reducing her maintenance to $27,500, Donna's circumstances were such that at that point she had about $300,000 in the bank on top of her retirement accounts. It was subject to a lot of debt. And Donna testified that she wanted to hold on to that money. It's her security blanket. It's her emergency fund. She wanted to be able to retire on it. It's academic at this point. Because by 2013, when we made application for fees to defend the appeal, Donna's assets, liquidity had been wiped out. She was actioning the whole to the tune of $88,000 in the red. She had about $125,000 left. She owed $90,000 in attorney's fees. She owed $55,000 in other debt. She owed $70,000 in retroactivity. She was wiped out. Clearly, she had no financial ability to continue paying fees and to litigate on an even playing field with David Heroy, who has the legal right to continue to pursue as he has and as he is before this court, again suggesting that permanent maintenance doesn't mean permanent, which it doesn't, by the way. But in his sense, she should always be able to get a better job. When the trial court said, you can earn $50,000 a year, we expect you to, and it wouldn't impact her maintenance at all. But the court should do away with the inability to pay standard. Even if this court decides not to apply the factors, it must do away with the inability to pay standard. Section 508 addresses financial resources. Nowhere does it speak to inability to pay. The only place that the legislature speaks to inability to pay is with regard to interim fee awards. So we have a three-part scheme. Requesting fees during the course of the divorce, interim fees. You have to have an inability to pay to collect fees from your spouse. It makes sense because it's nothing more than a placeholder. It's a Band-Aid to get to the end of the case, to avoid litigation over attorney's fees in the middle of a case, and at the conclusion of the case, the court can then order a contribution based upon all the pertinent factors. There they use the term inability to pay. But when you get to the next aspect of fees, contribution fees, nowhere do you find those words. When you get to asking for fees against your own former client, nowhere do you find the words inability to pay. And it's noteworthy that the legislature adopted the Uniform Act. Financial resources, Section 508. It was 313 of the Uniform Act. Financial resources. By adopting the Uniform Act, the court was doing away with any precedent as it relates to inability to pay. It was a new regime, a new standard. We've cited cases, for your honors, from other jurisdictions that have done away with the inability to pay requirement. And of course, there's cases in Illinois that have said the same thing. And whether they're following stare decisis or not following stare decisis is not really a pertinent debate for today. The question is, what does this court want to do going forward, and to what extent does the rationale of cases like Haken apply? I agree with the court in Haken where it says that it would eviscerate the statute to require an inability to pay standard when it was not intended and it defeats the purpose of leveling the playing field. Now, back to inability to pay for a second. I pointed out the fees that Donna's been required to pay, both $621,000 at the conclusion of the trial, for the trial fees, another $750,000 in post-decree, and how her assets have dwindled. Once Judge Jacobius found an inability to pay, it was perfectly appropriate for him then to turn to Mr. Heroy's resources to determine his ability to pay under that standard. Now, frankly, I believe that Judge Jacobius felt constrained by the language of Schneider, and we might have seen a bigger fee award had he applied the factors. We won't know that. But what's important is that he did follow Schneider and determined that David was well able to pay those fees, because David, unlike Donna, had a net worth of $5.4 million. That's not including his interest in his family business or in commercial property, which is substantial. David, unlike Donna, our experts said that in 2009, David's net cash flow, after paying Donna $420,000 in maintenance, all of his taxes, David had a net cash flow of over $800,000. Enough money to save for his retirement, enough money to pay all of his lifestyle expenses, enough money to pay all of her maintenance, and enough money to pay all of his legal fees. What litigant is able to spend as much or more than Donna has spent in legal fees during the course of this case, and his net worth has gone up, whereas Donna has no hope of her income going up in the future. So the court was appropriate, but it's worth pointing out to this court that the Hewitt decision is the most constrained version of Schneider that I believe we've ever seen. And that the case cries out for uniformity, the case cries out for the elimination of the inability to pay requirement, to follow financial resources. In the language of 508, the court does not adopt the 504 factors, but it is our position that the legislature is very clear. By adopting the section 504 factors, the court is accepting the principle that was enunciated by this court in the Pagano case. And I will just conclude with that. That in Pagano, this court stated, in dicta, the primary purpose of section 508 is to give the court the authority in a dissolution proceeding to equalize the relative positions of the parties before diminishing any advantage one spouse may have over the other in the presentation of the case due to disparity in their respective financial resources. That's the policy enunciated by this court, it's the policy of the legislature, and it's the policy that we're asking this court to adopt. Thank you. Thank you, Mr. Finkel. Ms. Jochner. Good morning, your honors. Chief Justice Carmeier. May it please the court, my name is Michelle Jochner, and I am with the law firm Schiller, DuCanto, and Fleck, and I represent the appellee cross-appellant, David Heroy. In 2005, eight years after the leveling of the playing field amendments to the Illinois Marriage and Dissolution of Marriage Act were enacted, your honors unanimously decided in re-marriage of Schneider, an opinion authored by Justice Thomas, wherein you held that section 508 of that act allows for an award of attorney's fees where a party is unable to pay and the other party has the ability to do so. In this case, the first district did exactly as it should, and it got it right on the fee issue. It applied your binding decision in Schneider, and it reversed the trial court's order that Mr. Heroy pay 160,000 of Mrs. Tukey's fees on the basis that she failed to satisfy her burden of proof that she had an inability to pay her own fees. Now, in her opening brief to this court, Mrs. Tukey violated at least five sections of Rule 341, and we point that out to your honors at pages 19 to 23. But apart from that, her argument in her opening brief consisted of block quotations from the statute and a wholehearted embrace of the faulty logic and the research. Can we just talk for a minute before you go on about Schneider? The parties in Schneider had only argued inability to pay, and as opposing counsel notes, Schneider referenced not only inability to pay, but also that the trial court had considered the statutory factors in denying contribution. And Schneider affirmed the appellate court's finding that the trial court did not abuse its discretion. What impact does the fact that no issue was raised in Schneider concerning whether inability to pay applied in light of the 97 amendments and the 2010 amendments had not yet even been enacted? So is this a good case for us to now address the amendments and inability to pay as opposing counsel would have us do? Yes, Your Honor. Schneider, first of all, was a pre-decree case, and that's different from our situation in a post-decree. But be that as it may, in Schneider, the issue was presented to your honors on cross-appeal by the wife. And I think that we have a right to assume that this court treated the cross-appeal with no less research nor analysis than the lead appeal was treated with. It was brought to this court, again, on a pre-decree case where you would look at 503 and 504 because you have a marital estate at that point. The court is trying to divide the marital estate, and that's a very important distinction in pre-decree cases as opposed to post-decree where you have no marital estate and you can't true it up. At the end. So that's a distinction. And this court appropriately applied the amended law. Again, it was eight years after the leveling of the playing field amendments at that time. And you correctly found that there was no contribution which was to be had by the wife at the end of the marital dissolution because she had an inability to pay based upon a division of the assets. And we are saying that the inability to pay concept that you applied in Schneider was absolutely correct. Your honors absolutely got it right with respect to the statute because as we point out in our brief to your honors, we did the best that we could with the best available resources to trace the evolution of the inability to pay concept from the earliest common law back towards the turn of the century and into the present. 1917. Part three of our brief describes this concept and traces its evolution. And in a nutshell, the inability to pay standard is deeply rooted in Illinois common law. It was codified in the 1977 enactment of the IMDMA. The subsequent legislative enactments have never altered the operative language in the first sentence of 508A through all of the different amendments that we've had. That's never been altered. And the General Assembly, I think quite significantly, never amended 508A after Schneider, after your decision at Schneider to express any type of displeasure with your inability to pay construction, which we believe shows legislative acquiescence. Now, again, as I said, we believe that the inability to pay concept is deeply rooted in early case law. Errato from 1917 is a very early case from your honors. And that inability to pay concept was repeated over and over by the Apollo court until such time that the legislature then codified these concepts in the 1977 enactment of the IMDMA. And we do cite to the historical and practice notes authored by Albert Jenner and Marshall Auerbach, and that's at page 38 and 39 of our brief, Mrs. Chouquet dismisses these practice notes as she calls them superseded practice notes and suggests that they be ignored. But that this is a very persuasive guidance. These notes have routinely provided to our courts of review and at last look on Westlaw referenced more than 400 times. Now, we are told by those practice notes that Section 508 was indeed derived, derived from provisions of the Uniform Marriage and Divorce Act with certain modifications. Mrs. Chouquet contends this means that earlier precedent must be rejected. And she cites Uniform Marriage of Goma and Cannibal, which is a decision from your honors, but that's wrong because Goma is factually in a posit because it construed the Uniform Interstate Family Support Act. That's your IFSA? Which Congress mandated be adopted by all states for federal funding and for reciprocal enforcement of financial orders. That's her citation to Goma and also to Delaware and Missouri cases are wholly off the mark. The practice notes tell us that, quote, prior decisional law is applicable to the construction of this requirement, which means that to this requirement of consideration of the financial parties. And this aligns with your decision in Uniform Marriage of Rogers. Statutes are construed with reference to the law existing prior to their enactment. They're not enacted in a vacuum. So in this case, counsel, the inability to pay overlays the statutory factors of 503 and 504? The inability to pay, yes, your honor, the inability to pay concept has been described in Inland Marriage of Byer, which was an appellate case which was decided shortly after the leveling of the playing field amendments came into effect and was one of the early cases to give some construction to those amendments. And they said, in that case, the appellate court said after the leveling amendments, quote, 508A is an umbrella provision. They used that word, an umbrella provision that links the separate fee statutes under the IMDMA. So statutes, as we know, as kind of the rule of statutory construction is that they must be read as a whole and you can't just plunk out one portion of the statute. Mrs. Trouquet looks at 503J in isolation, but it needs to be read in the context. The IMDMA is a statutory scheme. All the parts work together. 508A, the controlling language, has never, ever been amended by the legislature. Other parts have, as we point out, because the Byers Association, we sent you a few Byers Association articles, and those Byers Association articles are cited because they were written by the very committees that proposed them. They proposed and drafted the legislation. So they were targeting certain things when they were amending the statute that they saw in practice, in day-to-day practice. One of the things that they were not targeting was inability to pay. That always remained constant. They were looking at 501C13. That was added by the leveling amendments. And contrary to what Mrs. Trouquet's position is, the purpose is not to equalize all financial resources in a divorce case. That cannot be the purpose. That is an absurd result, which we cannot give to a statute. Also, she suggests a public policy to preserve integrity of maintenance awards. There's no citation to that. There's no such public policy. The policy of the inability to pay rule is to make sure that we don't have an automatic fee award in divorce cases. I mean, overarching everything is the American rule. The American rule is that every party pays their own fees. And that is also absolutely applicable to divorce cases. Parties will pay their own fees, except if they have an inability to pay. And I want to circle back, though, to this argument that Schneider is dicta. I'm sorry, that the inability to pay in Schneider is dicta. I'd like to point out to your honors that this was introduced as a brand new argument in Mrs. Trouquet's reply. It was not raised below anywhere prior to her reply to our response where we gave your honors a lot of information with respect to the evolution of this inability to pay concept. She wholeheartedly embraced Hagan until we explained in our brief to you how Hagan is decided on the bed of quicksand and doesn't stand up to any type of analysis. After that, she attempted to run away from that argument, but she can't. As hard as she tries, she can't run away from that argument because Hagan is the decision that was the catalyst to cause the split within the appellate court. So you have to deal with Hagan. In her brief, it's interesting to hear counsel say that he adopts Hagan. Now, in her reply brief to our response, it's not mentioned. Not once. Not once. Instead, she substitutes the argument that the inability to pay discussion in your honors case in Schneider is dictum. And we submit that because that was only submitted in a reply, that therefore it's forfeited under Rule 341H7. I would also like to say, just briefly comment on what the appellate court did. Again, the inability to pay concept is absolutely rooted in our law. Your honors were absolutely right to apply it in Schneider. And here the appellate court, applying Schneider, properly applying Schneider, correctly found reversible error in ordering Mr. Heroy to contribute to Mrs. Trucke's fees, pointing to three main sets of facts. First, Mrs. Trucke is a multimillionaire who received a 55% disproportionate share of the Maryland state in the amount of $3.7 million at the time of the 2006 divorce. Second, Mrs. Trucke received significant income in the form of roughly $4 million in maintenance for the past four years. Mr. Heroy paid her $35,000 per month, which is $420,000 annually, until it was modified by the trial of court during these proceedings, which still left her with $25,000 per month. And third, she had already paid all of what the parties agreed were her reasonable fees by the time of trial. The parties had stipulated at trial that the amount of her reasonable fees would be $345,000. The records show that she had actually, by that time that she submitted her fee petition, she had already paid $379,000 fees to her counsel, with about $1.5 million in maintenance. She had $80,000 yet to be owed on top of that, but she paid all of those fees at the time her petition for prospective fees in March 2013 was filed. So those three things were looked at by the appellate court to say that she failed to meet her burden of proof on inanibility to pay. In addition, the record evidence further supported this result and showed three additional significant factors why she did not have inanibility to pay. First, Mrs. Chouquet was paying three employees more than $50,000 per year to help with her daily activities, including putting gas in her car. She lost more than $160,000 on her in-home hobby business alert, which was valued at zero, worthless, at the time of dissolution, and which she herself testified at trial that she knew would never be profitable and was money lost forever. And you can find that at volume 13, page 10, and at volume 18, page 225 and 229. Ms. Chouquet, let me interrupt you for a moment. Obviously, you're discussing the facts, and of course, the facts are somewhat tricky to discern here since there was no index to the 50-volume record here. But in any case, I'm going back to the legal principle here, the Schneider issue. Are you saying that when the legislature significantly rewrote the statutes, including very specifically in terms of leveling the playing field, the issue of fees, that they chose not to use the words inability to pay because of some, and this is what I'm going to ask you to help me figure out, some jurisprudential idea that because this Court had long used those terms or had been part of the jurisprudence of this Court before the amendment, it was therefore to be written into the amendment despite the fact the language itself was not placed in the statute? Is that your argument? Well, Your Honor, it appears from tracing back through everything, it appears that the inability to pay was always understood. But when the legislature completely rewrites the statute, you're suggesting that we are to assume that they are incorporating the law that applied before the amendment? Is that your argument? Well, that particular, the controlling language in 508A was never touched. That first sentence was never touched. And again, the 1997 amendments, as we can see from the Bar Association articles, were targeted. They were targeted at certain clearly identified problems. Inability to pay was never one. Well, I mean, certainly that's a, the idea of lowering the plaintiff was the impetus for the statute. You're saying there was no reason for the legislature to include this concept into this new statute? Is that what you're saying? What we're saying is that it was always there. It was always understood from the get-go that this is what it meant to say that there was, that when you look at that language, that controlling language. Tell me, as a principle of statutory interpretation, we're trying to look at the statute as it was amended, as it currently is. And you're telling us that we should read into it law that existed before the amendment. Explain to me a principle of statutory interpretation that would be helpful for us to interpret the statute that way. Well, again, in line with what was said by Albert Jenner in the practice notes, which again are only persuasive and not binding at all, but he noted that at that, at the point of, when the IMDMA was codified in 1977, prior Illinois decisional law is applicable to the construction of the requirement in 508A, which was the requirement, specifically the language of considering the financial resource of the parties. And this principle aligns with your honors decision in Inter-Array Marriage of Rogers, where you explain that statutes are construed with reference to the law existing prior to their enactment. And this was a deeply rooted principle within the law. And in practice, this is the way, it works in practice this way. The 1997 leveling of the playing field amendments, again, the specific targeted problem that practitioners were seeing was that at the beginning of a case, when you had a traditional marriage situation, and you had a very, a moneyed spouse, and then perhaps a stay-at-home wife or something like that, it was a very specific targeted problem. Who didn't have access to the finances. That, the problem that was intended to be remedied by the leveling of the playing field was at the very beginning of a divorce case. And it was a lack of access. That's the leveling, is to be able to have access to funds at the beginning of a proceeding. And in, at page 45 of our brief, we put the ISBI article that says that you can have a very strong candidate for a temporary award because there's lack of access, but a very weak one for contribution at the end of the case because they have an ability to pay at that time. And to say it differently, they do not have an inability to pay. So it is our position that looking at the entire gamut of case law, statutory enactments, that the inability to pay is deeply rooted. It was never changed. And even after your honors said there was an inability to pay and construed 508A in Schneider to say that it had an inability to pay requirement, the legislature never came back and amended the statute to make it clear that it had an inability to pay. Now I see that my time is up. I would like to take just a moment to talk about our cross-relief. We have asked for cross-relief here as well. And if I could just have one moment to speak to that. We raised in our cross-relief that the trial court failed to properly consider and apply Section 510 of the IMDMA and that the court should have further reduced the amount of cross-relief that was intended to be paid. And that she did not satisfy the duty of all maintenance recipients to make reasonable efforts to work towards some level of contributing to her own self-support. The appellate court sidestepped this issue. If you look at paragraph 39 of the appellate court decision, the appellate court agreed with Mr. Heeroy on the res judicata issue and that the trial court was not barred from considering Mrs. Tukey's efforts post-2006. But then it said that because Mr. Heeroy achieved modification by showing a decline in his income, it was therefore unnecessary to address this additional basis. But Section 510 clearly says, the plain language of 510 says, the court shall consider all factors, including this one. And it's not an either-or analysis. The appellate court should have passed on the merits here, but it did not. So we don't have really a decision from the appellate court on the merits on this issue. We want to, again, looking at the statute, the plain language, again, it speaks for itself. In all such proceedings of modification of maintenance, the court shall consider the applicable factors, and one of them is the reasonableness of the efforts where they are appropriate. Here, the trial court found that she had made some efforts, but the test is reasonable efforts. Reasonable under the circumstances of each party's case. And here, Mrs. Tukey's efforts were not reasonable for three main reasons. First, she invested and lost more than $160,000 in alert. If I may, may I have one moment to conclude? Okay. She invested and lost more than $160,000 in alert, which the trial court itself characterized as, quote, throwing good money after bad. She made no efforts to rehabilitate herself or get any kind of training with respect to her librarian experience. She has a master's degree in library science, a law degree, but never made any efforts to retrain, even though the trial court noted in the dissolution order that she would likely be able to earn more if she would get some retraining. Mrs. Tukey never had done so. And finally, she did get some retraining, but it was for a $9 an hour H&R block tax preparer job, which is seasonal. So a minimum wage job, you know, a business this court should look at this, should apply the plain language of the rule and come up with the rule that all maintenance recipients should have a duty to make reasonable efforts. Okay. Thank you, Your Honors. Thank you very much. Mr. Finkel. Thank you, Your Honors. Colleague Rogers, I've been representing Donna Tukey for a very long time. Throughout the pre-judgment situation through all the post-judgment, I thought we were done hearing about Donna Tukey's efforts to obtain gainful employment. Yes, the trial court said that Donna, who had been out of the workplace for 20 years, where technology has completely surpassed anything that she could possibly do now without being completely trained, could make $30,000 a year as a law librarian. She tried to make a go of alert. I mean, I can't even believe I'm standing up here trying to excuse her conduct, which doesn't need any excuse. She tried to make a go of alert. It was David's position. You can see it on the record. But she could make a lot of money from alert. But she couldn't. She did throw good money out of bad, and she made the decision to end it. And she retrained herself, become a tax preparer. This court obviously doesn't know anything that Donna has done for the last five years. But that's what's ironic, or poignant at least, is that five years into a permanent maintenance award, Mr. O'Hara is challenging what she's done with her life post-divorce, now at age 66, what she should be able to do when the man makes $1.3 million a year in cash flow or more. On to more important issues, other than just to say that seeking employment is as appropriate to apply that factor. It's one factor. It's been considered time and time again. Now, I want to speak to the issue of legislative acquiescence. When the court adopted the Uniform Act, it wasn't drafted by our staff, by our legislature. It adopted a Uniform Act. So to suggest that the language of 508 somehow supports an inability to pay standard, which never existed in the sense of the Uniform Act, just flies in the face of common sense and the law. And this court has commented on legal acquiescence, and Judge Garman in particular, in In Re, the Marriage of Mathis, I believe, where she states, and you weren't the first one to state it, that it is a weak read on which the basis of determination of the draft was intended, especially when the language is so clear. We don't need to go through any legal gymnastics to determine what the legislature meant. It couldn't have been more transparent when they said level playing field. You don't have to read a lot of secondary materials. You don't have to read a lot of legislative history to know what the legislature was doing. And the secondary materials deal with more than the two issues. I mean, notwithstanding what counsel is quoting with regard to the secondary publications, it dealt with more than two issues. I've already explained the triumvirate scheme in terms of interim fees and contribution fees and fees at the end of the case against your own client. She made a mention, although I didn't have an opportunity to speak to it, that this is a post-judgment case and somehow that's different. But the plain language again of 503J states that it applies to any other proceedings under the subsection. I have for the life of me tried to figure out what that could mean other than any other proceedings such as post-judgment proceedings. And here, it's a maintenance proceeding. And the statute specifically says, follow the maintenance factors in determining attorney's fees under the section 504 factors. And we're not asking for equality, Judge. The principle of equality has been enunciated in many, many cases. And it's not true that Hagan created the split in the divisions. Go to any district and review the case law and it's all over the place. Some mention an ability to pay, but they temper it with the factors. Some mention an ability to pay, but they don't seem to apply the ability to pay. Some define undermining financial resources differently than others. But as I said before, I've never seen this draconian result. It's what we had the appellate court do in this case, given Donna's circumstances. I'm not going to comment on her being a millionaire. You can see the facts in the brief. I told the court what she's left with. She's left with a house, she's left with $800,000, $900,000 of retirement money, and she's left with some personal property. That's what she's left with. Yet she continues to have to fight. And we're not done, Judge. We'll be back again. I think that it's interesting that the language that Mr. Hurwoy uses in his brief, in terms of statutory construction, and I know I don't need to edify this court on statutory construction, but I just think it's meaningful here, where she states, Accordingly, in determining the intent of the General Assembly, this Honorable Court may properly consider not only the language of the statute, but also the purpose and necessity for the law, the evils sought to be remedied, and the goals to be achieved. Legislative intent can be recited from a consideration of the entire Act. We have an entire Act that's been amended from time to time that has all held up the principle of a disadvantaged spouse, from a financial perspective, should not be able to be outlitigated by their husband or wife. That's the principle that the statute deals with when we talk about an even playing field. And that's the principle that we're asking this court to apply. Now, Mr. Hurwoy would suggest that this language that they quote somehow upholds the concept that we should review secondary materials and ignore the plain language of the statute. And policy arguments that they make that just fly in the face of the statute. We have to have an inability to pay standard, because otherwise, because it will lead to more settlements. They actually said that in their brief. And it's just so transparent, Your Honor. What they're really saying is the moneyed spouse can take advantage of the other spouse, thereby requiring the other spouse to capitulate or to have to exhaust whatever resources they have. That's not the policy of the state. In conclusion, Your Honor, we would ask the court to find that the appellate court erred in reversing on the maintenance. We would ask that this court find that Donna's financial stability was undermined without that contribution for fees. If she had to pay David back $125,000, she would be financially crippled. We ask the court to find that inability to pay has no place in the statute. And that even if you don't apply the 504 factors for whatever reason, that we go back to what the statute says and talk about financial resources. And finally, Your Honor, we're asking that the court adopt what the legislature has already said. That we should apply 504 and 503 in the appropriate circumstances and determine and fashion appropriate and just fee awards as each case dictates. Thank you. Thank you. Case number 120205, Henry, the marriage of Duque and Heroy, will be taken under advisement as agenda number four. Thank you, Mr. Finkel and Ms. Jochner for your arguments. You are excused.